UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

———————————————

In re:                                                          Case No. DT 09-09550
                                                                Chapter 11
                                                                Hon. Scott W. Dales

NORTHERN NEWS COMPANY,

      Debtor.

————————————————————————/

In re:                                                          Case No. DT 09-09551
                                                                Chapter 11

HARBOR PARK STORAGE CO.,

      Debtor.

————————————————————————/

In re:                                                          Case No. DT 09-09554
                                                                Chapter 11

HARBOR PARK MARKET CO.,

      Debtor.

————————————————————————/

## OPINION REGARDING BANK'S MOTION FOR RELIEF FROM STAY AND DEBTORS' MOTION FOR USE OF CASH COLLATERAL

This opinion resolves two related but distinct motions in the jointly administered Chapter 11 cases involving three debtors, Northern News Company ("Northern"), Harbor Park Storage Co. ("Storage"), and Harbor Park Market Co. ("Market," and with Northern and Storage referred to collectively as the "Debtors"). The Debtors jointly filed a motion seeking permission to use the Bank's cash collateral (the "Cash Collateral Motion," DN 3),[1] and the Debtors' principal secured creditor, First Community Bank (the "Bank"), filed a Motion for Relief from Stay (the

———————————————

[1] The Debtors also filed an Emergency Motion for Use of Cash Collateral (DN 59) on September 29, 2009, while the original Cash Collateral Motion was still pending. For purposes of this Opinion the court will treat them as the same Motion.

"Lift Stay Motion," DN 45). Each party filed an Objection to the other's motion, and the court held an evidentiary hearing to consider them both on November 3, 2009 in Grand Rapids, Michigan.

## I.  JURISDICTION

The court has jurisdiction over the Debtors' cases pursuant to 28 U.S.C. § 1334(a).  The motions are "core proceedings" within the meaning of 28 U.S.C. § 157(b)(2)(G) (automatic stay) and (b)(2)(M) (cash collateral).  The following constitutes the court's findings of fact and conclusions of law in conformance with Fed. R. Civ. P. 52, applicable in these contested matters pursuant to Fed. R. Bankr. P. 7052 and 9014.

## II. TESTIMONY AND OTHER EVIDENCE

In support of the Cash Collateral Motion, the Debtors called Mr. Ronald E. Scherer, their president, and Mr. Kenneth Dean, the treasurer of an affiliated company who has provided accounting, tax, and finance advice to the Debtors over the years.

Mr. Scherer's testimony provided helpful background concerning the history and general operations of each Debtor, their corporate structure, and the Debtors' intentions with respect to their Chapter 11 cases.  The court credits his testimony as to historical facts, but not necessarily his predictions for the Debtors' future.

To summarize, Mr. Scherer explained that Northern is the longest-operating entity of the three Debtors, and the parent of Storage and Market.  He explained that Northern has been in business since the 1920s, and in his family since the 1960s.  Originally, the company distributed newspapers, magazines and other printed materials from its location on M-119, a state highway

in the vicinity of Petoskey and Harbor Springs, Michigan. The business focus changed in the late1960s, however, when Northern entered the self-storage business, presumably to make use of its warehouse space.

Though Northern's distribution business enjoyed success well into the mid-1990s, the distribution industry "collapsed" when large retailers, such as Walmart, began purchasing inventory directly from publishers, cutting out the middle links in the distribution chain. Reading the writing on the wall in 1996, Northern shifted gears by concentrating on its self-storage business and later by building a convenience store on a portion of the premises along M-119.   Northern completed the transition in the early 2000s, when it formed Storage and Market as separate corporations.

Presently, Northern owns the real estate, described as a five-parcel "campus," where it operates a 17,000 square foot warehouse, and where Storage and Market operate a 100,000 square foot self-storage facility, and an 8,200 square foot "hyper-convenience market," respectively.   Northern rents approximately 7,000 square feet of its warehouse to Allied EMS, an emergency medical provider serving northern Michigan, under a long-term, inflation-indexed lease with annual rental of approximately $40,000.00.  Northern is considering renting additional space to an individual who is interested in promoting bottled-water technology at the site.

The 100,000 square foot self-storage facility, which Mr. Scherer described as a "we store, you lock" business, is divided into approximately 650 individual storage units for rent to the public.  At present, the storage facility is 75-80% occupied.  To accommodate some of their tenants who are suffering financial hardship, Storage conducts a monthly flea market in a portion of the Northern warehouse, where tenants can sell items "on consignment" to generate funds to satisfy their rental obligations to Storage.  Storage offers this service as an alternative to evicting

the tenants and selling their stored property in a distress sale. Although Northern owns the real estate where Storage conducts its business, Storage has never paid rent for its occupancy because as Mr. Scherer explained, he was under the mistaken impression that each Debtor owned the real estate on which they sat. Only post-petition did he discover that Northern owned it all. According to Mr. Dean, Storage has been modestly profitable, albeit without paying rent to Northern.

For its part, Market runs a convenience store, with two car washes and a seven pump gas station. Within the convenience store or "C-Store," Market leases approximately 4,200 square feet to a Wendy's fast food franchisee that the Debtors know as SSM Holding Company ("SSM") from Alpena, Michigan. Although Northern owns the real estate where Market operates the C-Store, like Storage, Market has never paid rent for its occupancy. It appears from the testimony, that Market has not performed well either before or during the case, due in large measure to smaller than expected sales of gasoline after its first year in business and perhaps to Market's shortcomings in operating a fast-food franchise. Mr. Dean explained that increased gasoline sales generally translate into increased "cross sales" for the C-Store, such as snacks, candy, convenience store items, and car washes.

Although Mr. Scherer and his wife have been recently occupied in managing the Debtors, Mr. Scherer is also involved, generally as chairman of the board, in a variety of other businesses, many of which the Debtors have listed as creditors. These include Maples Healthcare, Inc., National Sign & Signal, Inc., West Virginia Health Care, Inc., West Virginia Periodicals Distribution, and NRS Equities.

Mr. Scherer's testimony established that the Debtors' businesses, or more precisely, Storage and Market's businesses, are seasonal, given their location in a resort area with a

population that swells in the late spring and summer, and recedes in the late fall and winter. There are a few "bumps" in business activity during the fall color tour and winter ski season, but these two Debtors earn most of their revenue in the summer months.  Market's C-Store experiences the greatest seasonal fluctuations, and though the self-storage business is more regular, it also has its seasonal ups and downs. Northern's long-term tenant seems to insulate that company from these cycles.

In addition, Mr. Scherer was able to shed some light on the Debtors' intentions regarding their Chapter 11 case, though he made it clear that the reorganization plan is inchoate and not yet drafted.  The Debtors' strategy falls into three categories.  First, as might be expected, the Debtors have tightened their belts, cutting store hours and personnel, utilizing Mr. Scherer and his wife as managers.  In addition, Market has found a new supplier of soap and chemicals for the car wash, and Mr. Scherer and his wife are making more purchases for the C-Store inventory from Sam's Club. Though these are steps in the right direction, compared to their $5.1 million debt to the Bank, the measures are quite modest, as Mr. Dean seemed to concede.

Second, as of last month, the Debtors have modified their relationship with SSM, moving from an arrangement in which Market operated the Wendy's franchise at a loss, to a lease arrangement in which SSM pays Market 8% of its adjusted sales. Mr. Dean estimated the resulting rent to range from $40,000 to $55,000 annually.[2]  This is a significant improvement to the bottom-line.

Third, Mr. Scherer told the court of the Debtors' idea to create a three-turbine "wind farm" on the M-119 parcel, to generate enough electricity to operate the Debtors, plus a surplus for the Debtors to sell onto the power grid.  Mr. Scherer stated that the Debtors "engaged" in a

---

[2] Mr. Scherer testified that Market and SSM agreed that SSM would resume operating the restaurant, after the franchisor's recent inspection.  The court infers that the franchisor was not satisfied with the manner in which Market was operating the restaurant.

wind study, and that the Michigan Department of Energy makes grants that could cover 70% of the costs. There is a private firm in Boston the Debtors might approach to provide an equity infusion for the balance of the startup costs. Mr. Scherer was considering tapping these grants and equity players to create a new entity that would lease the land for the turbines from the Debtors, and make lease payments by supplying the Debtors' electricity needs, plus a cash supplement. All of this, according to Mr. Scherer, can be in place sometime between July and December, 2010, supposedly at no expense to the Debtors. Mr. Scherer estimated that the wind farm would generate an additional $100,000.00 to $200,000.00 in positive cash flow, by both reducing utility expenses for the Market and providing cash infusions from surplus electricity sales. Beyond this, Mr. Scherer offered very few details regarding the project, such as those concerning the grant process, negotiations with additional equity providers, land use approvals and permits, environmental impact studies, construction time-tables, negotiations with prospective purchasers of surplus electricity, and other regulatory approvals.

In addition to the central role the wind farm would play in the reorganization, Mr. Scherer said a reorganization would also hinge on transferring the C-Store parcels from Northern to Market to assist Market in obtaining equity investment,[3] leasing excess warehouse space to a new tenant alongside Allied EMS, sharing expenses with similar companies, and further cooperating with their gasoline supplier. Finally, Mr. Scherer stated that "if financing is available, with all that, we'll be OK." Naturally, the testimony established that post-petition financing will be crucial to the success of the Debtors' reorganization.

At several points in his testimony, Mr. Scherer bemoaned the state of the credit markets for small businesses, admonishing financial institutions to "take a shower" and get back in the

---

[3] Mr. Scherer did not explain how transferring fully-encumbered real estate would assist in obtaining equity investment.

game.   He noted that the recent bankruptcy of The CIT Group, a frequent lender to small business, only makes matters worse.   Evidently discouraged, Mr. Scherer testified he has spoken about arranging financing with only one lender, a friend with whom he has enjoyed a long-standing personal banking relationship.   Mr. Scherer said he hoped he might get a "letter of interest" from his friend's employer.

In addition to Mr. Scherer's testimony, Mr. Dean, who is familiar with the Debtors' cash flow and business operations as a result of his years of service to Mr. Scherer and the Debtors, shed light on the Cash Collateral Motion. His testimony showed the Debtors' near-term cash flow predictions for the period of November, 2009 to the end of March, 2010. These projections were premised on the Debtors' future performance, recently instituted costs savings, lease revenues from the new lease arrangement with the Wendy's franchisee, as well as the changes to that franchise arrangement. See Debtors' Exhibit A.[4]   Mr. Dean's cash flow budget did not reflect any wind farm revenues.

Mr. Dean predicted that the Debtors would have to sell approximately 300,000 more gallons of gasoline, annually, than Market's present volume of 700,000 gallons per year, to produce an additional $36,000.00 per year in revenue.  This increase, however, depends upon gas prices not rising too much, and an economic turn-around, so that consumers will resume taking trips "up north" to play golf and enjoy the area's other amenities.   In addition, Mr. Dean noted that from June, 2008 to October, 2009, when Market was operating the Wendy's restaurant, the company lost approximately $25,000.00. However, the new arrangement with the Wendy's franchise should produce between $40,000 to $55,000 each year, depending on the sales volume at the C-Store.

---

[4] Although Mr. Dean's cash flow predictions reflected in Exhibit A are for each Debtor singly and all Debtors in the aggregate, Debtors' counsel's argument at the hearing addressed the cash flow situation in the aggregate. The court notes that the three cases are being jointly administered but have not been substantively consolidated.

The parties agreed that refinancing and credit would have to play a large part in the reorganization, by "taking out" the Bank in whole or in part, or otherwise permitting the Debtors to service the Bank and priority tax debt. Yet, each of the witnesses, including the Bank's executive vice president, Ed Arbut, agreed that credit markets, especially for small business, are essentially moribund. Although the Bank's chief loan officer credibly testified that his organization might consider making a loan, amortized over 20 years at 6 % interest, to an entity such as the Debtors, on cross-examination he testified the Bank has not made any such loans in Northern Michigan for quite some time.

## III. CASH COLLATERAL MOTION

Although the Debtors' aggregate cash position decreases by approximately $20,000.00 from November, 2009 to March, 2010, the court notes that during this same period, the Debtors propose to make approximately $30,000.00 in adequate protection payments. See Debtors' Exh. A. Much of the money represented in this payment will come from the Bank's cash collateral (specifically rents from the warehouse and the self storage facility), but a portion of the payments will be derived from the Debtors' post-petition operations.

The Debtors have also set aside funds to cover post-petition tax obligations, including debts secured or potentially secured by the Bank's collateral. Northern is making the bulk of the real estate tax escrow payments, as one might expect since it owns the land, yet Storage and Market are making some of the real estate tax payments, too, though neither is paying rent.

In the aggregate, the adequate protection proposal does not seem unreasonable: the Debtors are protecting the real estate from tax liens that might prime the Bank's mortgage, and they are making cash payments in an amount that exceeds the forecasted cash burn. From the

second page of Debtors' Exhibit A, however, it appears that the promised $6,000 per month adequate protection payments will come from Storage to cover the diminution of cash at Northern and Market. For example, Northern's starting cash balance for November, 2009 is $5,485.54, and its projected ending cash balance for March, 2010 is $1,730.74 -- a loss of $3,754.80. Market's starting cash balance for November, 2009 is $120,629.41, and its projected ending cash balance for March, 2010 is $104,467.40 -- a loss of $16,162.01. During this period, Northern and Market make no adequate protection payments, according to Exhibit A, but instead rely on Storage to do it for them. The situation at Storage, in contrast, shows less cash burn during the same period ($20,876.27), but this figure includes a $30,000.00 adequate protection payment. Thus, it appears from Exhibit A that Storage is subsidizing the costs of administering Northern and Market. Northern, for its part, is also subsidizing Storage and Market by not collecting rent.[5]

Therefore, although it appears from the testimony and Exhibit A that the Debtors' aggregate starting cash position will decrease in an amount less than the aggregate proposed adequate protection payments, it also appears that Storage will be making all of the adequate protection payments. Consequently, Storage can adequately protect the Bank for its own use of cash collateral, but the court is not satisfied that Northern and Market can do the same.

Granted, the Debtors' adequate protection proposal would suffice if the Debtors had been substantively consolidated, but they failed to do so and therefore each estate must bear its own costs of administration. The United States Bankruptcy Court for the Southern District of Texas recently denied a jointly administered but substantively unconsolidated debtor's use of cash collateral where the aggregate adequate protection proposal depended on using the assets from

---

[5] The Debtors offered no evidence of the fair rental value of Market's or Storage's premises, so the court cannot determine whether Northern's rent subsidy offsets the subsidiaries' tax escrow payments and adequate protection payments. See 11 U.S.C. § 362(g).

one estate to prop up the other.  In withholding approval, Judge Bohm observed that "[t]he administrative expenses of one jointly administered debtor should not be paid out of the other jointly administered debtor's cash collateral because joint administration does  'not affect the substantive rights of claimants or the respective debtor estates.'"  See In re Las Torres Development, L.L.C., 413 B.R. 687, 698-99 (Bankr. S.D. Tex. 2009) (quoting In re McKenzie Energy Corp., 228 B.R. 854, 874 (Bankr. S.D. Tex. 1998)).  Like the debtors in Las Torres Development, Market, Northern, and Storage each has different assets and different liabilities.  Using Storage's assets to pay the costs of administering the Market and Northern cases could prejudice Storage's administrative creditors.  The court finds persuasive the reasoning in Las Torres Development, and is unwilling to approve the Debtors' proposal in the aggregate.

Accordingly, the court will enter an order granting the Cash Collateral Motion as it pertains to Storage, but denying the motion as it pertains to the other two Debtors. Moreover, Storage must take care not to use its assets for expenses other than its own.[6]

IV. THE LIFT STAY MOTION

The court may grant relief from stay after notice and a hearing for cause, including lack of adequate protection. See 11 U.S.C. § 362(d)(1).  Here, the parties stipulated that the Bank's primary collateral is not losing value. Under the circumstances, the court does not find "cause" for lifting the stay under 11 U.S.C. § 362(d)(1).   The parties also stipulated, however, that the Debtors have no equity in the real estate and therefore, under 11 U.S.C. § 362(d)(2), the issue becomes whether the property is necessary for an effective reorganization. See 11 U.S.C. § 362(d)(2)(B). At this early stage in the case, the Debtors are not required to prove they have a

---

[6] As in Las Torres Development, the court would consider a renewed cash collateral motion premised on a budget that recognizes the separate identity of the jointly administered estates, assuming such a budget is possible under the circumstances.

confirmable plan, but the court must nevertheless consider general confirmation requirements and the Debtors' intentions when deciding whether there is an effective reorganization "in prospect." See United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365 (1988).  Early in the life of a bankruptcy case, a party opposing a motion under 11 U.S.C. § 362(d)(2) has a lighter burden than the burden it must carry as time goes by. In re Holly's, Inc., 140 B.R. 643, 699-700 (Bankr. W.D. Mich. 1992) ("[I]f the relief from stay is requested at the early stages of the bankruptcy case, the burden upon the debtor is less stringent. But, if relief from the stay is requested later in the case, the debtor's showing is closely scrutinized.").  Nevertheless, if the futility of the reorganization is patent early in the case, the court should not hesitate to grant relief from stay: the main reason for interfering with a creditor's state law rights -- preserving the prospect for reorganization -- no longer justifies the statutory injunction.

The Bank, as the party requesting relief from stay has the burden of proof on the issue of the debtor's equity in property, and the party opposing such relief has the burden on everything else.  See 11 U.S.C. § 362(g).  As noted above, the parties bench-filed a stipulation of facts establishing by agreement that the Northern has no equity in the real property. See Stipulation at ¶ 18.  The court therefore finds that the Bank has met its burden of proof under 11 U.S.C. § 362(d)(2)(A) and (g). Likewise, based upon the testimony, the court has no difficulty in concluding that the Bank's collateral is necessary to any reorganization of the Debtors.

The more difficult question, however, is whether there is a reorganization "in prospect." Timbers, 484 U.S. at 376. This standard requires the court to balance the hardships caused by the automatic stay against the possibility of the Debtors' reorganization.  The court acknowledges this Chapter 11 proceeding is barely three months old and some courts have hesitated to grant

relief from stay during the infancy of a case. See, e.g., In re Holly's, Inc., 140 B.R. at 699-700; In re Plastech Engineered Products, Inc. 382 B.R. 90 (Bankr. E.D. Mich. 2008). This motion, though filed early in the bankruptcy proceeding, is filed almost two and a half years after the state court authorized the Bank's judicial foreclosure. The Debtors' difficulties with the Bank date back many years and, in fact, were initially resolved against the Debtors by the entry of a money judgment and judgment of foreclosure on May 30, 2007 (the "Judgment"). Testimony established that the Bank and the Debtors entered into two forbearance agreements (the "Agreements") in the time between entry of the Judgment and the filing of the bankruptcy petition. Although the Debtors made some payments during the forbearance period, they nevertheless defaulted on the Agreements. The Debtors filed their cases on the eve of the foreclosure sale. These facts suggest the court should not place too much weight on the relatively short interim between the filing of the petition and the filing of the Lift Stay Motion, because even though the Lift Stay Motion may have occurred early in the case, it did not occur early in the dispute. The Bank has not acted hastily.

According to the testimony, the success of any reorganization of these Debtors depends upon: (1) obtaining financing from a post-petition lender; (2) the prompt construction and success of the wind farm; and (3) obtaining an equity infusion in order to meet the absolute priority rule. Taking these in order, each of the witnesses confirms that the prospects of obtaining financing for these small business Debtors is dim, given the present state of the credit markets and the fact that the estates' property is fully encumbered. Moreover, although the need to refinance has been obvious since the Bank filed its state court complaint, the Debtors have been unable to obtain it. According to Mr. Scherer, the single possible lender he has contacted is a long-time business acquaintance, who might be inclined to recommend a loan out of respect for

Mr. Scherer and his companies. The solitary contact, with hopes of success premised on affinity rather than underwriting, strikes the court as insufficient, especially given the importance of refinancing to the prospects for reorganization.

Next, each witness agreed that a reorganization will be contingent upon the creation and financial success of the wind farm. As with the post-petition financing, the facts regarding the Debtors' progress on the notion of a wind farm were not detailed or persuasive enough to show an impending reorganization. First, the wind farm is a business that is dramatically different from the Debtors' present operations. The court is generally skeptical of debtors who come to court with hopes of entering a new line of business in an effort to escape from an old one. Second, the wind farm would depend upon obtaining grant monies and equity infusions from a variety of entities around the country, both governmental and private, yet the record contains no details surrounding these important first steps. The court also believes that a wind farm project will likely involve substantial state, local, and federal approvals, given the changes in the land use, potential impact on the locality and wildlife, and the highly regulated nature of the electrical generation industry. Mr. Scherer's suggestion that the windmills will be online sometime between July and December of 2010 seems quixotic indeed. It is simply unduly idealistic to think that the construction of these windmills and their profitability will occur within a realistic time frame for proposing a reasonable plan of reorganization, and without any expense to the Debtors. Even crediting Mr. Scherer's earnest desire to make all this happen, the notion that the Debtors can move from self-storage and C-Store operators to a generator of surplus electricity in a year or less, strikes the court as far-fetched. In addition, it would seem that any benefit from this wind farm would inure to the property owner, Northern, and not Market, as hoped.

Finally, other than feasibility, the most troubling confirmation hurdle[7] the Bank's counsel raised is the absolute priority rule.   See Bank of America National Trust and Savings. Association v. 203 North LaSalle Street Partnership, 526 U.S. 434 (1999).   Under that rule, the court cannot permit Mr. Scherer and the family trust to retain or receive any property on account of their prior equity interest in the Debtors unless "old equity" infuses substantial new value into the enterprises. Mr. Scherer's testimony on cross examination established that in view of the recent economic downturn, neither he nor any of his companies is able to make an equity infusion.   Although the Debtors' counsel hypothesized in closing argument that the economy might turn around and Mr. Scherer and his entities may eventually be able to infuse substantial value into the Debtors, it is without support in the record.   Because the Bank put the new value and absolute priority rule in issue, and the Debtors bear the burden of proof of establishing an effective reorganization "in prospect," the obvious difficulty in surmounting the absolute priority rule is one more factor supporting the court's conclusion that an effective reorganization is not in prospect. Timbers, supra.

Accordingly, the court finds the Debtors have not met their burden of proving that an effective reorganization is in prospect, and will enter a separate order granting the Lift Stay Motion.

---

[7] The Bank's counsel argued that many of the creditors enumerated on the Debtors' schedules are insiders and therefore not entitled to vote or participate in the reorganization balloting.   Certainly, the testimony of Mr. Scherer suggested he exercises considerable influence over these other entities, but the court is not persuaded these entities are "insiders." Even crediting the Bank's interpretation of the testimony -- that Mr. Scherer controlled the Debtors and the enumerated entities, it does not necessarily follow that these entities controlled the Debtors. See 11 U.S.C. § 101(31).   Certainly, the record does not permit the court to find these challenged creditors are even "affiliates," a term with precise meaning under 11 U.S.C. § 101(2), and therefore insiders. As a result, the court is not inclined to agree with the Bank's counsel's argument under 11 U.S.C. § 1129(a)(10).   This inclination however, shall not bind the parties for purposes other than resolving these motions.

## V. CONCLUSION

At first blush, it would appear that in deciding to grant the Lift Stay Motion and the Cash Collateral Motion as to Storage, the court has issued inconsistent judgments. However, in response to the court's questioning during closing argument, the Debtors' counsel correctly stated that granting the Lift Stay Motion does not compel the Bank to take any action with respect to property of the estate. It merely authorizes the Bank to do so.

Accordingly, while the Bank considers its options with respect to the permission to enforce its state law rights, Storage will need to use cash collateral. It is also conceivable the Bank, which has shown a proclivity to forbear already, may elect to continue to do so in an effort to consider more fully the Debtors' prospects for reorganization. The Debtors may make a more persuasive case for the wind farm in their negotiations with the Bank than they did at the hearing on these motions. If so, the Bank and the Debtors might enter into an agreement setting tight deadlines for a plan process or the treatment of the Bank's claims in a plan of reorganization. Such an agreement might be premised on a variety of factors and nuances that were not made clear to the court during the hearing, and of course must respect the fact that the Debtors are not substantively consolidated. Regardless, after considering each motion independently and together, the court is convinced that granting the Lift Stay Motion is not inconsistent with granting the Cash Collateral Motion as to Storage.

The court will prepare a separate order granting the Cash Collateral Motion as to Storage only, and granting the Lift Stay Motion as to the property of each estate.

**IT IS SO ORDERED.**

Scott W. Dales
United States Bankruptcy Judge

**Dated: November 10, 2009**